**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEVAKAR INJECTABLES, INC. and LONG GROVE PHARMACEUTICALS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>INFORLIFE SA and WG CRITICAL CARE, LLC,<br><br>Defendants. | Civil Action No. 22-6886 (JXN)(AME)<br><br><br>**OPINION**<br>**FILED UNDER SEAL**[1] |

**NEALS**, District Judge

This opinion interprets three disputed terms in patents[2] for an injectable blood pressure medication. The medication consists of a liquid solution, norepinephrine, a chelating agent, and a tonicity agent. Plaintiffs Nevakar Injectables, Inc., and Long Grove Pharmaceuticals, LLC ("Plaintiffs"), and Defendants Inforlife SA and WG Critical Care, LLC ("Defendants") disagree on the meaning of "chelating agent," "tonicity agent," and terms describing ranges. Plaintiffs and Defendants submitted opening claim construction briefs, (ECF Nos. 136 and 134, respectively) and responsive briefs, (ECF Nos. 161 and 159, respectively). The Court held a *Markman*[3] hearing on June 2, 2025. After carefully considering the parties' written submissions and oral arguments, the Court construes the disputed claim terms as set forth below.

---

[1] Because the Court has cited to sealed documents (*see, e.g.*, ECF Nos. 134, 159, 161), it files this Opinion under temporary seal. The parties shall file a motion that complies with Local Civil Rule 5.3 on or before March 13, 2026 if they desire to keep this Opinion or any portion thereof under seal. If no such motion is timely filed, the seal will be lifted.

[2] The patents are U.S. Patent Nos. 10,226,436 ("'436 patent"); 10,420,735 ("'735 patent"); 10,471,026 ("'026 patent"); 10,568,850 ("'850 patent"); 10,646,458 ("'458 patent"); 11,413,259 ("'259 patent"); and 11,602,508 ("'508 patent") (collectively, "Asserted Patents").

[3] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

I.    **BACKGROUND**

A.    **The Asserted Patents**

The Asserted Patents are for an injectable norepinephrine blood pressure medication. *See, e.g.*, '508 Patent col. 3 ll. 52–55. Norepinephrine has been used to treat low blood pressure since the 1950s. (Pinal Decl. ¶ 25, ECF No. 134-4.) But norepinephrine is difficult to work with; it does not dissolve in water. (*Id.*) To solve this problem, scientists mixed norepinephrine with acid to form a salt. (*Id.* ¶ 26.) The only norepinephrine salt approved in the United States is norepinephrine bitartrate, which is formed by mixing norepinephrine and tartaric acid. (*Id.*) But norepinephrine bitartrate breaks down when exposed to light or oxygen. (*See id.* ¶ 27.) It also becomes unstable in high or low pH solutions. (*Id.* ¶ 37.)

Earlier norepinephrine bitartrate medications, particularly Levophed, were concentrated. (*Id.* ¶ 26.) The user would dissolve the norepinephrine bitartrate in sugar or salt water before use. '508 Patent col. 2 ll. 3–7. However, dilution raises the risk of errors or infection. *Id.* ll. 15–17. To prevent oxygen decomposition, Levophed has an antioxidant. (Pinal Decl. ¶ 29.) Antioxidants react with oxygen so other chemicals (such as norepinephrine) do not. (*Id.*) But the antioxidant in Levophed can trigger severe allergic reactions. (*Id.*) Other norepinephrine bitartrate medications used different antioxidants, but those other antioxidants caused liver or kidney damage. '508 Patent col. 3 ll. 30–32.

The Asserted Patents attempt to solve the problems associated with injectable norepinephrine. The norepinephrine in the Asserted Patents is pre-diluted in a sterile pH-controlled solution. *Id.* col. 3 ll. 52–59. The Asserted Patents, moreover, do not use an antioxidant to prevent oxygen from reacting with the norepinephrine. *Id.* col. 3 ll. 52–55. Instead, the Asserted Patents reduce the rate of oxygen degradation with a chelating agent. *Id.* col. 3 ll. 60–64. A chelating agent

is a compound that takes metal ions and binds them to other metals in a stable ring-like structure

called a "chelate." (Pinal Decl. ¶ 39.) Norepinephrine bitartrate contains metal ions, which make

it easier for oxygen to react with and break down norepinephrine. (*Id.* ¶ 38.) So, if a chelating agent

takes away the metal ions in norepinephrine bitartrate, oxygen degrades the norepinephrine much

more slowly. (*Id.*)

## B.    The Claims

Below are the claims in the Asserted Patents.

### The '735 Patent

1. A method of treating hypotension, comprising:
   administering a ready-to-administer norepinephrine composition at an initial dose per minute;
   administering the norepinephrine composition at a maintenance dose per minute, wherein the initial dose per minute is greater than the maintenance dose per minute;
   wherein the initial dose per minute is a dose of between 8 and 12 µg/min, and wherein the maintenance dose per minute is a dose of between 2 and 4 µg/min;
   wherein the norepinephrine composition comprises norepinephrine or a salt thereof at a concentration of between 10 µg/ml and 100 µg/ml in an aqueous acidic solution having a pH range of between 3.7 and 4.3, wherein the aqueous acidic solution further comprises a chelating agent at a concentration of between 1 µg/ml and 100 µg/ml and a tonicity agent;
   wherein the norepinephrine composition is substantially free of antioxidants; and
   wherein the norepinephrine or a salt thereof in the norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity, over at least three months as determined by HPLC.

14. A method of administering a ready-to-administer norepinephrine composition to an individual in need thereof, comprising:
   administering the norepinephrine composition at an initial rate of between 8 and 12 µg/min;
   adjusting administration of norepinephrine composition to a maintenance rate of between 2 and 4 µg/min;
   wherein the norepinephrine composition comprises norepinephrine or a salt thereof at a concentration of between 10 µg/ml and 100 µg/ml as a base and further comprises a chelating agent in an amount of between 1 µg/ml and 100 µg/ml;
   wherein the norepinephrine composition is substantially free of antioxidants; and
   wherein the norepinephrine composition comprises norepinephrine or a salt thereof in an aqueous acidic solution having a pH range of between 3.7 and 4.3, wherein the aqueous acidic solution further comprises a tonicity agent; and
   wherein the norepinephrine or a salt thereof in the norepinephrine composition comprises at least about 90% R-isomer of norepinephrine or a salt thereof after storage at 25±2° C. and 60±5% relative humidity, over at least three months as determined by HPLC.

### The '508 Patent

1. A ready-to-administer norepinephrine composition, comprising:
   an aqueous solution having a pH range of between 3.7 and 4.3, wherein the aqueous solution comprises:
   norepinephrine present at a concentration of between 10 µg/ml and 100 µg/ml, wherein the norepinephrine initially comprises at least 95% of R-isomer as determined by HPLC;
   a chelating agent comprising a tartrate bicarboxylic acid, wherein the chelating agent is present at a concentration of between 10 µg/ml and 100 µg/ml; and
   a tonicity agent,
   wherein the ready-to-administer norepinephrine composition is substantially free of antioxidants; and
   wherein after storage at 25±2° C. and 60±5% relative humidity over at least three months, the norepinephrine comprises at least 90% R-isomer as determined by HPLC.

### The '850 Patent

1. A sterile, ready-to-administer, packaged norepinephrine composition, comprising:
   a container filled with a sterile, ready-to-administer norepinephrine composition and packaged in a secondary container;
   wherein the sterile, ready-to-administer norepinephrine composition comprises norepinephrine or a salt thereof in an amount of between 10 µg/ml and 100 µg/ml, a chelating agent in an amount of between 1 µg/ml and 100 µg/ml, a tonicity adjusting agent in an amount of between 0.6 wt % and 1.2 wt %, and an aqueous acidic solution, wherein the norepinephrine comprises at least 95% of R-isomer of norepinephrine;
   wherein the sterile, ready-to-administer norepinephrine composition is substantially free of antioxidants;
   wherein the sterile, ready-to-administer norepinephrine composition has a pH of between 3.7 and 4.3; and
   wherein the sterile, ready-to-administer, packaged norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity, over at least three months as determined by HPLC.

3

## The '436 Patent

1. A ready-to-administer norepinephrine composition, comprising:
an aqueous acidic solution having a pH range of between 3.7 and 4.3, wherein the aqueous acidic solution further comprises a chelating agent and a pharmaceutically acceptable salt;
wherein the chelating agent is present in an amount of between 1 μg/ml and 100 μg/ml, and wherein the pharmaceutically acceptable salt is present in an amount of between 0.6 wt % and 1.2 wt %;
norepinephrine dissolved at a concentration suitable for administration to a patient in need thereof, wherein the norepinephrine is an R-isomer;
wherein the ready-to-administer norepinephrine composition is substantially free of antioxidants; and
wherein the ready-to-administer norepinephrine composition is formulated such that after storage over at least three months equal or less than 10% of the R-isomer form will isomerize to the S-isomer and such that equal or less than 5% of the total norepinephrine will degrade to degradation products.

19. A method of treating hypotension, comprising:
administering the ready-to-administer norepinephrine composition according to claim 1 at an initial dose per minute; and
administering the ready-to-administer norepinephrine composition according to claim 1 at a second dose per minute, wherein the initial dose per minute is greater than the second dose per minute.

13. A method of preparing a ready-to-administer norepinephrine composition according to claim 1, comprising:
formulating a liquid parenteral composition that contains in an aqueous acidic solution norepinephrine as an R-isomer such that:
(a) the formulation exhibits less than 10% of isomerization of the R-isomer to an S-isomer after three months of storage of the liquid composition, and
(b) the formulation exhibits equal or less than 5% degradation of total norepinephrine after three months of storage of the liquid composition;
wherein the aqueous acidic solution has a pH range of between 3.7 and 4.3, and wherein the aqueous acidic solution further comprises a chelating agent and a pharmaceutically acceptable salt;
wherein the total norepinephrine is present in the liquid parenteral composition at a concentration of between 10 μg/ml and 100 μg/ml; and
wherein the ready-to-administer norepinephrine composition is substantially free of antioxidants,
thereby obtaining a ready-to-administer norepinephrine composition according to claim 1.

## The '026 Patent

1. A method of controlling S-isomer content in a ready-to-administer norepinephrine composition comprising:
admixing an R-isomer of norepinephrine or salt thereof, a chelating agent and a tonicity agent into an aqueous acidic solution having a pH between 3.7 and 4.3;
wherein the chelating agent is present in an amount of between 1 μg/ml and 100 μg/ml, and wherein the tonicity agent is present in an amount of between 0.6 wt % and 1.2 wt %; and
wherein the concentration of norepinephrine or salt thereof is between 10 μg/ml and 100 μg/ml, and wherein the composition is substantially free of antioxidants.

## The '458 Patent

1. A method of preparing a sterile, ready-to-administer norepinephrine composition, comprising the steps of:
(a) combining norepinephrine or a salt thereof, a chelating agent, a tonicity adjusting agent, and an aqueous acidic solution to form a liquid parenteral composition, wherein the norepinephrine comprises at least 95% of R-isomer of norepinephrine, wherein the norepinephrine or salt thereof is present in the liquid parenteral composition in an amount of between 10 μg/ml and 100 μm/ml, wherein the chelating agent is present in the liquid parenteral composition in an amount of between 1 μg/ml and 100 μm/ml, and wherein the tonicity adjusting agent is present in the liquid parenteral composition in an amount of between 0.6 wt % and 1.2 wt %;
(b) adjusting the pH of the liquid parenteral composition to a pH range of between 3.7 and 4.3;
(c) filling the liquid parenteral composition into a container; and
(d) heat sterilizing the liquid parenteral composition in the container to sterility to form the sterile, ready-to-administer norepinephrine composition;
wherein the sterile, ready-to-administer norepinephrine composition is substantially free of antioxidants; and
wherein the sterile ready-to-administer norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity, over at least three months as determined by HPLC.

4

| The '259 Patent | |
|---|---|
| 1. A method of preparing a storage stable, substantially antioxidant-free ready-to-administer norepinephrine composition that exhibits, after three months of storage in a container, less than 10% of isomerization of an R-isomer of norepinephrine to an S-isomer and equal or less than 5% degradation of total norepinephrine, the method comprising: admixing an R-isomer of norepinephrine bitartrate to a solution to produce an aqueous solution that contains the R-isomer of norepinephrine in an amount of equal or less than 100 μg/ml; wherein aqueous solution comprises a chelating agent in an amount of between 1 μg/ml and 100 μg/ml, and a pharmaceutically acceptable salt in an amount of between 0.6 wt % and 1.2 wt %; and adjusting pH of the aqueous solution to a range of between 3.7-5.0. | 11. A storage stable, substantially antioxidant-free ready-to-administer norepinephrine composition that exhibits, after three months of storage in a container, less than 10% of isomerization of an R-isomer of norepinephrine to an S-isomer and equal or less than 5% degradation of total norepinephrine, comprising: an R-isomer of norepinephrine bitartrate in an aqueous solution that contains the R-isomer of norepinephrine in an amount of equal or less than 100 μg/ml; wherein aqueous solution comprises a chelating agent in an amount of between 1 μg/ml and 100 μg/ml, and a pharmaceutically acceptable salt in an amount of between 0.6 wt % and 1.2 wt %; and wherein the pH of the aqueous solution is in a range of between 3.7-5.0. |
| 20. A storage stable, substantially antioxidant-free ready-to-administer norepinephrine composition that exhibits, after three months of storage in a container, less than 10% of isomerization of an R-isomer of norepinephrine to an S-isomer and equal or less than 5% degradation of total norepinephrine, comprising: an R-isomer of norepinephrine bitartrate in an aqueous solution that contains the R-isomer of norepinephrine in an amount of at least 64 μg/ml; wherein aqueous solution comprises a chelating agent in an amount of between 1 μg/ml and 100 μg/ml, and a pharmaceutically acceptable salt in an amount of between 0.6 wt % and 1.2 wt %; wherein the chelating agent is selected from the group consisting of a bicarboxylic acid, a tricarboxylic acid, and an aminopolycarboxylic acid; and wherein the pH of the aqueous solution is in a range of between 3.7-5.0. | |

(Pls.' Moving Br. iv–vi, ECF No. 136.) Taken together, the Asserted Patents are for an injectable medication comprising an aqueous solution within a certain pH range; norepinephrine, a chelating agent, and a tonicity agent, each within a certain range of concentrations; and stored at a certain temperature. *See, e.g.*, '508 Patent col. 20 l. 64 to col. 21 l.15.

## C.    Prosecution History

Defendants also made an injectable norepinephrine medication to control low blood pressure ("Infringing Product"). (*See* Tech. Tutorial Tr. at 113:3–11, ECF No. 106.) Unlike Plaintiffs' formulation, the Infringing Product does not include a separate chelating agent. (*Id.*) In November 2022, Plaintiffs sued Defendants for patent infringement. (*See* Compl., ECF No. 1.)

In August 2023, Defendants requested leave to file a motion for summary judgment. (*See* Aug. 1, 2023 Letter, ECF No. 84.) Defendants argued the Court should adopt the claim construction set forth in a similar proceeding before the District of Delaware in *Baxter Healthcare Corp. v. Nevakar Injectables, Inc.*, No. 21-1184, 2023 WL 4175261 (D. Del. June 26, 2023). (*Id.*)

5

There, Nevakar sued the maker of an injectable norepinephrine blood pressure medication whose formulation did not include a separate chelating agent. *Baxter*, 2023 WL 4175261, at *1–3. Plaintiffs argued that, because the bitartrate part of norepinephrine bitartrate is a chelator, norepinephrine bitartrate *itself* is a chelating agent within the meaning of the Asserted Patents. *Id.* at *3. The defendants argued the chelating agent in the Asserted Patents is a separately added chemical. *Id.* The Court in *Baxter* adopted the defendants' interpretation. *Id.* at *4–8. Defendants here argued this Court should rule the same way, and should conclude that, because the Infringing Product does not have a separate chelating agent, it could not infringe on the Accused Patents. (Aug 1, 2023 Letter.)

The Court denied the request and instead held a Technology Tutorial and evidentiary hearing on January 3, 2024. (*See* August 21, 2023 Order, ECF No. 90; Tech. Tutorial Tr.) The Court then held a *Markman* hearing on June 2, 2025, where it heard oral argument from the parties. (*See Markman* Tr., ECF No. 185.) In addition, the parties submitted *Markman* opening briefs, (Pls.' Opening Br., ECF No. 136; Defs.' Opening Br., ECF No. 134) and responsive briefs (Pls.' Opp'n Br., ECF No. 161; Defs.' Opp'n Br., ECF No. 159).[4]

## II.    LEGAL STANDARD

Finding patent infringement is a two-step process. *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804 (Fed. Cir. 2007). First, the Court determines the meaning of the disputed claim terms. *Markman*, 517 U.S. at 384. Then, the Court compares the claims to the infringing product. *Id.* This case is at the first step.

---

[4] The Court notes that, in the *Markman* briefs, the parties contested the terms "bicarboxylic acid," "tartrate bicarboxylic acid," "norepinephrine/norpepinephrine," and "substantially free of antioxidants." (*See* Pls.' Opening Br; Defs.' Opening Br.) The parties have since agreed to constructions for all those terms. (*See, e.g.*, May 30, 2025 Letter, ECF No. 183.) The Court, accordingly, does not address them here.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). So, the Court starts with the language of the claim itself. *Id.* The Court gives claim terms "their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.* "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* The specification is "the written description and the claims of the patent." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 n.6 (Fed. Cir. 2019) (quoting *Cisco Sys., Inc. v. TQ Delta, LLC*, 928 F.3d 1359, 1362 (Fed. Cir. 2019)). "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314.

The Court may also look at the patent's prosecution history, i.e., "the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Id.* at 1317. While the prosecution history "often lacks the clarity of the specification," it can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, the Court must consider "extrinsic evidence." *Id.* Extrinsic evidence is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). Extrinsic evidence can "help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. But it is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1318. Accordingly, extrinsic evidence cannot "trump the persuasive intrinsic evidence." *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1222 (Fed. Cir. 2020) (citation omitted).

## III.  DISCUSSION

### A.  Chelating Agent

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|---|
| "Chelating Agent" | "A compound containing donor atoms that can combine by coordinate bonding with a single metal ion to form a cyclic structure called a chelating complex, or simply, a chelate." | "A separate chemical compound, added to the composition"<br><br>To the extent it becomes necessary to construe what a chelating agent actually is, Defendants submit that a chelating agent is a separate chemical compound, added to the composition, "with at least two donor groups that form a stable ring structure with a metal ion" | "A separate chemical compound containing at least two donor atoms or donor groups able to bind a metal ion to form a stable ring structure." |

### i.    Is The "Chelating Agent" a Distinct Ingredient?

Claims in all seven Asserted Patents use term "chelating agent." *See* '508 Patent col. 21 ll. 5–7; '850 Patent col. 20 ll. 36–43; '735 Patent col. 21 ll. 45–51; '436 Patent col. 21 ll. 44–47; '458 Patent col. 20 ll. 44–46; '026 Patent col. 20 ll. 28–33; '259 Patent col. 22 ll. 7–10. The first (and most contested) dispute over "chelating agent" is whether "chelating agent" must be a distinct chemical compound, or whether norepinephrine bitartrate—the bitartrate portion of which is capable of chelating—can itself be the "chelating agent." (*See* Pls.' Opening Br. at 8–17; Defs.' Opening Br. at 8–20.) Plaintiffs argue "chelating agent" should be defined, essentially, as a chemical that can chelate. (Pls.' Opening Br. at 8–10.) Because the bitartrate part of norepinephrine bitartrate can chelate, and a single ingredient can serve multiple functions, Plaintiffs assert norepinephrine bitartrate can be the "chelating agent." (*Id.*) Defendants respond that, because "chelating agent" is identified and listed separately from the other ingredients in the Asserted Patents, it should be construed as a distinct element. (Defs.' Opening Br. at 8–11.)

In *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, the Federal Circuit held that "where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, 130 F.4th 1372, 1379 (Fed. Cir. 2025) (quoting *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010)). *Becton* did not "create a *per se* rule that separately listed claim elements are distinct components, regardless of the intrinsic record." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024). Rather, *Becton* establishes "a 'presumption' that separately listed claim limitations may indicate separate and distinct physical structure, but that presumption may always be rebutted in the context of a particular patent." *Id.* To overcome the *Becton* presumption, "there must be evidence that shows that the impliedly

distinct components, instead, can be satisfied by a single component." *Regeneron*, 130 F.4th at 1380. "Such evidence may be intrinsic or extrinsic, though it is difficult to envision *Becton'*s clear implication of separateness being overcome without at least a suggestion of non-separateness in the intrinsic evidence." *Id.*

The claim language itself favors treating "chelating agent" as a distinct ingredient. To start, all the claims list "chelating agent" separately from "norepinephrine." *See* '508 Patent col. 21 ll. 5–7; '850 Patent col. 20 ll. 36–43; '735 Patent col. 21 ll. 45–51; '436 Patent col. 21 ll. 44–47; '458 Patent col. 20 ll. 44–46; '026 Patent col. 20 ll. 28–33; '259 Patent col. 22 ll. 7–10. For instance, Claim 1 of the '508 Patent is for a "norepinephrine composition" in an aqueous solution comprising: (1) "norepinephrine"; (2) "a chelating agent comprising a tartrate bicarboxylic acid"; and (3) "a tonicity agent." Because "norepinephrine" is distinct from "a chelating agent," *Becton* counsels they should be treated separately. Likewise, Claim 1 of the '735 Patent is for a compound of "norepinephrine or a salt thereof . . . in an aqueous acidic solution . . . , wherein the aqueous acidic solution further comprises a chelating agent . . . and a tonicity agent." '735 Patent col. 21 ll. 45–51. The phrase "further comprises" signals that norepinephrine, a chelating agent, and a tonicity agent "are distinct components of the . . . composition." *Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*, No. 12-5311, 2015 WL 5032650, at *14 (D.N.J. Aug. 25, 2015). Likewise, the claims in the '026 and '458 Patents require "admixing" or "combining" norepinephrine and a chelating agent. '026 Patent col. 20 ll. 31–33; '458 Patent col. 20 ll. 44–45. "Using terms like 'admixing' and 'combining' in this way signals that the 'chelating agent' is an entirely separate chemical compound as compared to the other ingredients with which it is being 'admix[ed]' or 'combin[ed]' into the solution—including 'norepinephrine or a salt thereof.'" *Baxter*, 2023 WL 4175261, at *5.

The remaining intrinsic evidence reinforces the *Becton* presumption. "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* Here, a review of the claims in the Asserted Patents reveals norepinephrine and the chelating agent are not only identified separately, but also are assigned different concentrations and measurements.[5] The "clear implication" of using different amounts of the two components "is that the components are separate and distinct." *In re Aflibercept Pat. Litig.*, No. 23-39, 2024 WL 4958308, at *13 (N.D.W. Va. Oct. 1, 2024), *aff'd sub nom.*, *Regeneron*, 130 F.4th at 1372.

The specifications also reinforce the presumption of separateness. For instance, the specification compares the oxygen degradation in the Asserted Patents to existing norepinephrine *bitartrate* medications. *See, e.g.*, '508 Patent col. 2 l. 25 to col. 3 l. 32. This does not suggest that norepinephrine bitartrate could be the chelating agent. Likewise, the specification treats the introduction of the chelating agent differently from the norepinephrine, stating:

> Most typically, the chelating agent is *present* in an amount of between 1 µg/ml and 100 µg/ml, and the pharmaceutically acceptable salt is present in an amount of between 0.6 wt % and 1.2 wt %. Norepinephrine . . . is *dissolved* at a concentration that is suitable for administration to a patient in need thereof

---

[5] *See* '850 Patent col. 20 ll. 36–40 ("[The] norepinephrine composition comprises norepinephrine or a salt thereof in an amount of between 10 µg/ml and 100 µg/ml, [and] a chelating agent in an amount of between 1 µg/ml and 100 µg/ml . . . ."); '735 Patent col. 21 ll. 45–51 ("[W]herein the norepinephrine composition comprises norepinephrine or a salt thereof at a concentration of between 10 µg/ml and 100 µg/ml . . . [and] further comprises a chelating agent at a concentration of between 1 µg/ml and 100 µg/ml . . . ."); '436 Patent col. 21 ll. 49–51 ("[W]herein the chelating agent is present in an amount of between 1 µg/ml and 100 µg/ml . . . [and] norepinephrine dissolved at a concentration suitable for administration to a patient in need thereof . . . ."); '458 Patent col. 20 ll. 44–54 ("[W]herein the norepinephrine or salt thereof is present . . . in an amount of between 10 µg/ml and 100 µm/ml, [and] wherein the chelating agent is present . . . in an amount of between 1 µg/ml and 100 µm/ml . . . ."); '026 Patent col. 20 ll. 48–55 ("[W]herein the chelating agent is present in an amount of between 1 µg/ml and 100 µg/ml, and . . . wherein the concentration of norepinephrine or salt thereof is between 10 µg/ml and 100 µg/ml . . . ."); '259 Patent col. 22 ll. 4–8 ("[A]n aqueous solution that contains . . . norepinephrine in an amount of equal or less than 100 µg/ml [and] . . . comprises a chelating agent in an amount of between 1 µg/ml and 100 µg/ml . . . .").

*Id.* col. 3 ll. 61–67 (emphasis added). Likewise, the specification's technical discussion of chelating agents makes clear that the chelating agent is separate from the norepinephrine:

> Moreover, in further contemplated aspects, the formulation will also include one or more chelating agents, and particularly metal ion chelators. For example, suitable chelators include various bicarboxylic acids, tricarboxylic acids, and aminopolycarboxylic acids such as ethylenediaminetetraacetic acid (EDTA), ethylene glycol-bis(β-aminoethyl ether)-N,N,N',N'-tetraacetic acid (EGTA), and penta(carboxymethyl)diethylenetriamine (DTPA), and salts and hydrates thereof. While not limiting to the inventive subject matter, it is contemplated that the metal ion chelators will slow down both the baseline and metal ion-stimulated autoxidation of norepinephrine.
>
> Remarkably, the inventors unexpectedly observed that the desirable effect of the chelators was observable at relatively low concentrations of the chelators. For example, reduction of the baseline and metal ion-stimulated autoxidation of norepinephrine was observed at chelator concentrations of between 1 µg/ml and 10 µg/ml, and between 10 µg/ml and 100 µg/ml. Interestingly, the chelators, and especially the aminopolycarboxylic acids retained stabilizing effect despite the relatively low pH favoring protonated forms of the chelators.

*Id.* col. 6 ll. 46–64. At no point does the specification discuss, or even contemplate, the use of norepinephrine bitartrate as the chelating agent.

Moreover, the Asserted Patents compare the degradation of their composition with a chelating agent to the degradation of existing norepinephrine bitartrate medications, each of which lacked a chelating agent. *See, e.g.*, *id.* tbls. 1–3. The Asserted Patents then conclude "the norepinephrine at ready-to-inject concentrations underwent significant degradation." *Id.* col. 3 ll. 15–17. If norepinephrine bitartrate could serve as the chelating agent, "then it would seem strange that the specification would describe a composition that includes norepinephrine bitartrate and no separate chelator as one that was insufficient to meet the goals of the patent." *Baxter*, 2023 WL 4175261, at *6 n.13.

Finally, the prosecution history reinforces that "chelating agent" is a distinct ingredient in the composition. During prosecution, the patent examiner rejected the '735 Patent's claims as

obvious over Levophed. (*See* Defs.' Ex. 29 ("'735 Patent History") at *35, ECF No. 135-28.) The examiner noted that Levophed "also includes sodium chloride as a tonicity agent. The norepinephrine is in the form of norepinephrine bitartrate, which meets the limitations of claims 6-7 and 19." (*Id.* (citations omitted).) The examiner continued, "[t]he difference between the prior art and the claims at issue is that [Levophed] does not specifically disclose the claimed composition, i.e., that it is substantially free of antioxidants, the claimed concentrations, it further includes a chelating agent, or the claimed functional properties." (*Id.* (citations omitted).)

> Plaintiffs replied that the '735 Patent was different from Levophed, in part, because of:

> [T]he experimental data that clearly establish that stability of norepinephrine is unexpectedly and significantly increased in formulations where a chelating agent and the norepinephrine are present at low concentrations (e.g., norepinephrine is present in the composition at a concentration of between 10 ug/ml and 100 ug/ml and the chelating agent is present in the composition in an amount of between 11ug/ml and 100 ug/ml, specifically between 10 pg/ml and 100 ug/ml), and where the composition has a pH in the range of between 3.7 and 4.3.

(*Id.* at *47.)

As discussed above, the prosecution history can "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. The prosecution history reveals that (1) the examiner understood that the '735 Patent, unlike Levophed, had a chelating agent, and (2) the applicants replied by noting that, unlike Levophed, including a chelating agent in a norepinephrine medication increased its stability. Had the examiner, or the inventors, understood the chelating agent to not be distinct from the other ingredients, they would have said (a) that Levophed had a chelating agent, or (b) that the Asserted Patents included another chelating agent in addition to

norepinephrine bitartrate. They did not. So, the prosecution history comports with the plain language of the claims and the specification—that "chelating agent" is a distinct ingredient.

In sum, the plain language of the claims, the specifications, and the prosecution history support the *Becton* presumption that "chelating agent" is separate and distinct from the other components in the Asserted Patents.

To rebut the *Becton* presumption, there must be evidence showing "the impliedly distinct components, instead, can be satisfied by a single component." *Regeneron*, 130 F.4th at 1380. Plaintiffs point to no such evidence. Instead, they make two arguments the Court finds unpersuasive.

First, Plaintiffs reiterate that "there is nothing to prevent the bitartrate portion of norepinephrine bitartrate from providing the chelating ability" for the composition. (Pls.' Opening Br. at 10.) This is, of course, true. But the question under *Becton* is not whether bitartrate is a capable of chelating—it is. The question is instead whether the Asserted Patents treat "chelating agent" as an element distinct from the other components of the composition. And here, both the claims and specifications in the Asserted Patents clearly indicate to a person of ordinary skill in the arts that norepinephrine bitartrate cannot be both the norepinephrine component and the chelating agent.

Second, Plaintiffs note the Asserted Patents are for ready-to-administer compositions, not the directions on how to make the compositions. (Pls.' Opening Br. at 10.) Plaintiffs thus argue the Asserted Patents require only that a chelating agent be *present*, regardless of how it got there. (*Id.*; Pls.' Opp'n at 8.) Specifying when, where, or how the chelating agent gets into the composition would, in Plaintiffs' telling, import process limitations to a composition claim. (Pls.'

Opening Br. at 12.) Plaintiffs, therefore, conclude that requiring a "chelating agent" be added separately would read a process limitation into a composition claim.

This argument misses the mark. To be sure, the term "composition" in chemistry "generally refers to mixtures of substances." *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1244 (Fed. Cir. 2002). A composition exists "at the moment the ingredients are mixed together." *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1558 (Fed. Cir. 1995). Accordingly, a composition claim includes "any product at any time that contains the claimed proportions of ingredients." *Id.* How or when the ingredients end up in the mixture is irrelevant. *See Sanofi-Aventis U.S. LLC v. Sandoz, Inc.*, 345 F. App'x 594, 597 (Fed. Cir. 2009). Plaintiffs argue that requiring the chelating agent to be separately added to the mix would impermissibly limit the processes by which Plaintiffs could make their claimed composition.

But recognizing "chelating agent" as a distinct ingredient does not dictate when, where, or how it is added. All *Becton* presumes is that separately listed elements are "logically or conceptually distinct," unless the evidence says otherwise. *Merck Sharp & Dohme Corp v. Fresenius KABI USA, LLC*, No. 14-4989, ECF No. 83, at 5 (Oct. 30, 2015). The evidence in this case does not say otherwise. Rather, the intrinsic evidence demonstrates that "chelating agent" is conceptually distinct from the other ingredients, including norepinephrine. The chelating agent prevents norepinephrine bitartrate from oxidizing. The norepinephrine bitartrate raises the patient's blood pressure. The Asserted Patents do not use norepinephrine bitartrate to prevent norepinephrine bitartrate from oxidizing. Nor did the Asserted Patents contemplate that doing so was possible. Put more simply, when, where, and how the chelating agent gets into the composition

15

is irrelevant. What matters is that the chelating agent is distinct from the other listed ingredients. The Court, therefore, construes "chelating agent" as "a separate chemical compound."[6]

### ii.   Definition of Chelating Agent

Having determined that a chelating agent is distinct from the other listed ingredients in the composition, the Court turns to the second disagreement over "chelating agent." Plaintiffs argue "chelating agent" is a "compound containing donor atoms that can combine by coordinate bonding with a single metal ion to form a cyclic structure called a chelating complex, or simply, a chelate." (Joint Claim Constr. Statement at 7.) Defendants reply that a "chelating agent" is a chemical compound "with at least two donor groups that form a stable ring structure with a metal ion." (*Id.*) Defendants argue their definition is more accurate because all chelating agents must: (1) contain at least two donor groups and (2) form a stable ring-like structure. (*See* Defs.' Opening Br. at 20–21.) Defendants also argue that a chelating agent must actually chelate. The mere ability to chelate, by itself, does not make a chemical a chelating agent.

The Asserted Patents do not define the term "chelating agent." An undefined claim term is given the "meaning that the term would have to a person of ordinary skill in the art." *Phillips*, 415 F.3d at 1313. Extrinsic evidence, such as technical dictionaries, treatises, and expert testimony, "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. "Within the class of extrinsic evidence, . . . dictionaries and treatises can be useful in claim construction." *Id.* at 1318. Because dictionaries "collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among

---

[6] Because the Court need not determine when, where, or how the chelating agent enters the composition, specifying that it be added separately is beside the point. *See Sanofi-Aventis*, 345 F. App'x at 597. However it ends up in the composition, the chelating agent cannot be identical to the norepinephrine or its salt equivalent, the tonicity agent, the aqueous solution, or any other ingredients.

the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Id.* Expert testimony can also help

> to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.

*Id.* "However, conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.*

### a.    Ability to Chelate

The parties disagree over whether a chelating agent need only be able to chelate. According to Plaintiffs, a substance that *can* chelate is a chelating agent. In Defendants' telling, a chelating agent must *actually* chelate. Having reviewed the intrinsic and extrinsic evidence, the Court concludes a chelating agent is a chemical that *can* chelate.

Nothing in the record supports Defendants' contention that a chelating agent must actually chelate. To the contrary, the Academic Press Dictionary of Science, which Defendants repeatedly cite, defines a chelating agent as "a substance that is *capable of* forming a chelate with a metal ion." (Defs.' Ex. 23 ("Academic Press Dictionary of Science") at *8, ECF No. 24 (emphasis added).) *Cf. Chelating Polymer*, Int'l Union of Pure & Applied Chemistry Gold Book, https://doi.org/10.1351/goldbook.CT07154 (last visited Feb. 6, 2026) (defining a chelating polymer as a polymer "containing ligand groups *capable of* forming bonds . . . between two or more separate binding sites within the same ligand group and a single atom." (emphasis added)). Defendants' expert, too, defines "chelating agent" in terms of the ability to chelate. (*See* Pinal Decl. ¶ 90 ("It is a threshold requirement that a chelating agent *be able to* coordinate to a metal ion with at least two donor groups.") (emphasis added).) Defendants offer no intrinsic or extrinsic

17

evidence to the contrary. Accordingly, the Court construes a chelating agent as being capable of chelating.

### b.    "At Least Two Donor Groups"

Having resolved whether a chelating agent needs only the ability to chelate, the Court turns to the properties of a chelating agent. The Court agrees with Defendants that a person of ordinary skill in the arts would understand that a chelating agent must contain molecules with at least two donor atoms or groups capable of binding to a metal ion.[7] Chelation is "[t]he formation or presence of bonds (or other attractive interactions) between *two or more separate binding sites within the same ligand* and a single central atom." *Chelation*, Int'l Union of Pure & Applied Chemistry Gold Book, https://doi.org/10.1351/goldbook.C01012 (last visited Feb. 6, 2026) (emphasis added).[8] "A molecular entity in which there is chelation (and the corresponding chemical species) is called a 'chelate.'" *Id.* Chemicals with "single binding sites to the respective metal atom . . . are *not normally* thought of as chelates." *Id.* (emphasis added). Defendants' expert further cites the Academic Press Dictionary of Science and the Kirk-Othmer Concise Encyclopedia to conclude that "[i]t is a threshold requirement that a chelating agent be able to coordinate to a metal ion with at least two donor groups." (Pinal Decl. ¶ 90. *See also* Academic Press Dictionary of Science at *8; Defs.' Ex. 30 ("Kirk-Othmer Concise Encyclopedia") at *4, ECF No. 29.) Plaintiffs offer no comparable evidence to establish that chelating agents may contain less than two donor groups. At most, Plaintiffs' expert states, without elaboration or support, that such an interpretation is

---

[7] A group is a "defined linked collection of atoms or a single atom within a molecular entity" with similar chemical properties. *Group*, Int'l Union of Pure & Applied Chemistry, https://doi.org/10.1351/goldbook.G02705 (last visited Feb. 6, 2026). A donor, in this context, means "[a] molecular entity that can transfer an electron to another molecular entity, or to the corresponding chemical species." *Electron Donor*, Int'l Union of Pure & Applied Chemistry, https://doi.org/10.1351/goldbook.E01988 (last visited Feb. 6, 2026).

[8] A ligand is an ion or molecule joined to a central atom. *See Ligands*, Int'l Union of Pure & Applied Chemistry, https://doi.org/10.1351/goldbook.L03518 (last visited Feb. 6, 2026).

18

inconsistent with the Asserted Patents. (Anderson Decl. ¶ 81, ECF No. 136-1.) But this is the kind of bare expert assertion the Court need not credit. *Phillips*, 415 F.3d at 1318. The Court, therefore, concludes a person of ordinary skill in the art would understand a chelating agent has at least two donor atoms or donor groups to bind a metal ion.[9]

### c.    "A Stable Ring Structure"

The Court also agrees with Defendants that the ring-like structure formed through chelation must be stable. To start, the intrinsic evidence supports this interpretation. The Asserted Patents use chelators to slow down oxidization and specifically refer to the "stabilizing effect" of chelators on the composition. *See* '508 Patent col. 6 l. 63. If the chelators did not form stable structures with metal ions, the structures would fall apart, the metal ions would be released, and they would again cause oxygen to degrade the norepinephrine. The extrinsic evidence also buttresses that the ring-like structure must be stable. (*See* Academic Press Dictionary of Science at *8 (defining a chelate as "a highly stable complex formed between a metal ion and more than one organic group to form a ring.").) Accordingly, the Court agrees a chelating agent must form a stable ring-like structure.

### iii.    *The Court's Construction*

In sum, the Court construes a chelating agent as "a separate chemical compound containing at least two donor atoms or donor groups able to bind a metal ion to form a stable ring structure."

---

[9] In addition to the number of donors, the parties dispute whether "donor groups" or "donor atoms" is the correct term. (*See* Pls.' Opening Br. at 16–17; Defs.' Opening Br. at 20–21.) Because a "group," in the context of chemistry, can encompass "a single atom within a molecular entity," "group" is more correct. *Group*, Int'l Union of Pure & Applied Chemistry, https://doi.org/10.1351/goldbook.G02705 (last visited Feb. 6, 2026). Nevertheless, to encompass the widest array of possible configurations, the Court defines a chelating agent as having at least two donor atoms *or* donor groups. What matters is that the chelating agent has two distinct binding sites. It does not matter whether each of those two binding sites consists of one donor atom or several.

B.    **Tonicity Agent**

| Claim Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction | The Court's Construction |
|---|---|---|---|
| "tonicity agent" / "tonicity adjusting agent" | "agent to adjust the tonicity of the solution to obtain the desired osmolality" | "a separate chemical compound, added to the composition, that increases the osmolality of the composition" | "a separate chemical compound that increases the osmolality of the composition" |

The parties disagree about whether (1) a tonicity agent is a separate and distinct ingredient from the other ingredients in the composition, and (2) whether a tonicity agent adjusts the tonicity of the solution or increases its osmolality. (*Id.*) The Court considers each point in turn.

### i.    *Is "Tonicity Agent" a Separate Ingredient?*

As with "chelating agent," the Asserted Patents consistently identify "tonicity agent" as a separate ingredient in the composition. *See* '508 Patent col. 21 ll. 1–9; '850 Patent col. 20 ll. 36–43; '735 Patent col. 21 ll. 45–51; '436 Patent col. 21 ll. 42–51; '458 Patent col. 20 ll. 44–56; '026 Patent col. 20 ll. 28–33; '259 Patent col. 22 ll. 7–10. For instance, Claim 1 of the '508 Patent is for a "norepinephrine composition" in an aqueous solution comprising: (1) "norepinephrine"; (2) "a chelating agent comprising a tartrate bicarboxylic acid"; and (3) "a tonicity agent."

Because the Asserted Patents list "tonicity agent" separately, the Court presumes the inventors intended to treat it as distinct from the other ingredients in the composition. *Becton*, 616 F.3d at 1254. The intrinsic evidence again bolsters the *Becton* presumption. The Asserted Patents consistently set "tonicity agent" apart from the other ingredients, use language such as "further comprises," *see* '735 Patent col. 21 ll. 45–51, and assign the tonicity agent different amounts and measurements, *see, e.g.*, '458 Patent col. 20 ll. 44–56 ("wherein the norepinephrine or salt thereof is present . . . in an amount of between 10 µg/ml and 100 µm/ml, wherein the chelating agent is

20

present . . . in an amount of between 1 µg/ml and 100 µm/ml, and wherein the tonicity adjusting agent is present . . . in an amount of between 0.6 wt% and 1.2 wt %."). None of the intrinsic evidence, moreover, indicates the tonicity agent can be the same as any of the other ingredients. Accordingly, for the same reasons articulated above, the Court construes "tonicity agent" as a separate chemical compound.

### ii.    Does The Tonicity Agent Adjust Tonicity or Increase Osmolality?

Osmolality measures "the concentration of dissolved molecules in solution." (Pinal Decl. ¶ 152.) Tonicity measures "the effect of osmolality on living cells." (*Id.*) The Asserted Patents contemplate using a tonicity agent to increase tonicity and osmolality. For instance, the specification of the '580 Patent states:

> With respect to suitable salts it is contemplated that the salt is a pharmaceutically acceptable salt *that can be used to increase tonicity*.

> Depending on the particular salt concentration, additional tonicity agents may be added . . . . The amount of tonicity adjusting agent used *can* be adjusted *to obtain osmolality of the formulations in the range of 260 to 340 mOsm/kg*. An osmometer can be used to check and adjust the amount of tonicity adjusting agent to be added to obtain the desired osmolality

'580 Patent col. 6 l. 65 to col. 7 l. 11 (emphasis added). And, according to Defendants' expert, "a tonicity agent can only increase osmolality." (*Id.*) Plaintiffs do not seriously dispute this point, (*see Markman* Hearing Tr. 94:10–12) and offer no intrinsic or extrinsic evidence to suggest a tonicity agent can do anything other than increase the osmolality of the composition. The Court, therefore, concludes the tonicity agent increases the osmolality of the composition.

### iii.    The Court's Construction

For the reasons stated above, the Court construes "tonicity agent" as "a separate chemical compound that increases the osmolality of the composition."

C.    Range Terms

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction | The Court's Construction |
|---|---|---|---|
| "an amount of between 0.6 wt % and 1.2 wt %" | "an amount of between 0.6 wt % and 1.2 wt %" | "an amount of between exactly 0.6 wt % and exactly 1.2 wt %" | "an amount of between exactly 0.6 wt % and exactly 1.2 wt %" |
| "between 1 µg/ml and 100 µg/ml" | "between 1 µg/ml and 100 µg/ml" | "between exactly 1 µg/ml and exactly 100 µg/ml" | "between exactly 1 µg/ml and exactly 100 µg/ml" |
| "between 10 µg/ml and 100 µg/ml" | "between 10 µg/ml and 100 µg/ml" | "between exactly 10 µg/ml and exactly 100 µg/ml" | "between exactly 10 µg/ml and exactly 100 µg/ml" |
| "in an amount of equal or less than 100 µg/ml" | "in an amount of equal or less than 100 µg/ml" | "in an amount of exactly equal or less than 100 µg/ml" | "in an amount of exactly equal or less than 100 µg/ml" |
| "in an amount of at least 64 µg/ml" | "in an amount of at least 64 µg/ml" | "in an amount of exactly at least 64 µg/ml" | "in an amount of exactly at least 64 µg/ml" |
| "between 1 µg/ml and 10 µg/ml" | "between 1 µg/ml and 10 µg/ml" | "between exactly 1 µg/ml and exactly 10 µg/ml" | "between exactly 1 µg/ml and exactly 10 µg/ml" |
| "a range of between 3.7 - 5.0" | "a range of between 3.7 - 5.0" | "a range of between exactly 3.7 – exactly 5.0 at the time of formulation" | "a range of between exactly 3.7 – exactly 5.0" |
| "between 3.7 and 4.3" | "between 3.7 and 4.3" | "between exactly 3.7 and exactly 4.3 at the time of formulation" | "between exactly 3.7 and exactly 4.3" |
| "between 3.7 and 4.0" | "between 3.7 and 4.0" | "between exactly 3.7 and exactly 4.0 at the time of formulation" | "between exactly 3.7 and exactly 4.0" |
| "range of between 4.0 and 4.2" | "range of between 4.0 and 4.2" | "range of between exactly 4.0 and exactly 4.2 at the time of formulation" | "range of between exactly 4.0 and exactly 4.2" |
| "between 260 mOsm/kg and 340 mOsm/kg" | "between 260 mOsm/kg and 340 mOsm/kg" | "between exactly 260 mOsm/kg and exactly 340 mOsm/kg" | "between exactly 260 mOsm/kg and exactly 340 mOsm/kg" |
| "between 8 and 12 µg/min" / "between 2 and 4 µg/min" | "between 8 and 12 µg/min" / "between 2 and 4 µg/min" | "between exactly 8 and exactly 12 µg/min" / "between exactly 2 and exactly 4 µg/min" | "between exactly 8 and exactly 12 µg/min" / "between exactly 2 and exactly 4 µg/min" |

22

The parties have two broad disagreements about ranges (such as for concentration or pH) in the Asserted Patents. First, the parties disagree about whether the ranges are exact or approximate. Plaintiffs argue the ranges are approximate; Defendants assert the ranges are exact. (*See* Pls.' Opening Br. at 20–26; Defs.' Opening Br. at 22–29.) Second, the parties disagree about whether the pH ranges refer to pH at the time of formulation. Plaintiffs say "no"; Defendants say "yes." (*See id.*)

### i. Are The Ranges Exact or Approximate?

"[W]hen a patent includes qualifying language for certain claim limitations but omits it from others, the claims without such approximation language should be construed with numerical precision." *Baxter*, 2023 WL 4175261, at *15. This is because a person of ordinary skill in the arts understands that "inventors [know] how to express ambiguity in claim language when they so desire[]." *Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1365 (Fed. Cir. 2014). Thus, it is "particularly appropriate" to assign "numerical precision to composition ranges . . . when other variables in the same claims explicitly use qualifying language." *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1381 (Fed. Cir. 2000).

Here, each of the Asserted Patents use qualifying language for some claim limitations, but not others.[10] This is persuasive evidence that qualified claim limitations are approximate and the

---

[10] *See* '508 Patent col. 21 ll. 12–13 ("[W]herein after storage at 25±2° C. and 60±5% relative humidity over at least three months . . . ."); '850 Patent col. 20 ll. 48–51 ("[W]herein the sterile, ready-to-administer, packaged norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity . . . ."); '735 Patent col. 21 ll. 54–57 ("wherein the norepinephrine or a salt thereof in the norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity . . . ."); '436 Patent col. 22 ll. 11–13 ("[W]herein the norepinephrine is present at a concentration of 16 μg/ml ( +/-10%), 32 μg/ml (+/-10%), or 64 μg/ml (+/-10%)."); '458 Patent col. 20 l. 66 to col. 21 l. 3 ("[W]herein the sterile ready-to-administer norepinephrine composition comprises at least about 90% R-isomer of norepinephrine after storage at 25±2° C. and 60±5% relative humidity . . . ."); '026 Patent col. 22 ll. 56–60 ("[W]herein, the norepinephrine or a salt thereof in the composition comprises at least about 95% R-isomer of

23

others are not. This interpretation also comports with the specification, which explicitly states that

only *some* numbers are approximate:

> In some embodiments, the numbers expressing quantities of ingredients, properties such as concentration, reaction conditions, and so forth, used to describe and claim certain embodiments of the invention are to be understood as being modified in some instances by the term "about." Accordingly, in some embodiments, the numerical parameters set forth in the written description and the attached claims are approximations that can vary depending upon the desired properties sought to be obtained by a particular embodiment.

'508 Patent col. 20 ll. 23–31. Plaintiffs' "proposed construction would moot this language to

require that the Range Terms be interpreted as approximations in every single instance, even when

the claims do not use the word 'about' or something like it." *Baxter*, 2023 WL 4175261, at \*15.

Accordingly, the Court construes the range terms as exact.[11]

### ii.    Are pH Ranges Determined at Time of Formulation?

The norepinephrine composition in the Asserted Patents includes "an aqueous solution

having a pH range of between 3.7 and 4.3." '508 Patent col. 20 ll. 66–67. Defendants argue the

Asserted Patents cover the pH of the aqueous solution only at the time the composition is

formulated. (*See* Defs.' Opening Br. at 25–29.) Plaintiffs reply that the Asserted Patents do not

include a time limit on the pH of the aqueous solution. The Court agrees with Plaintiffs.

---

norepinephrine after storage at $25\pm2°$ C. and $60\pm5\%$ relative humidity . . . ."); '259 Patent col. 22 ll. 13–15 ("[W]herein the norepinephrine is present at a concentration of about 16 µg/ml.").

[11] Plaintiffs argue the that "[a]pplication of the significant figures convention is the standard practice that Courts follow to read claims that recite a specific number." (Pls.' Moving Br. at 23.) But the cases Plaintiffs cite are unavailing. In the first, *Vifor Fresenius Medical Care Renal Pharma Ltd. v. Teva Pharmaceuticals USA, Inc.*, the court held "'at a pH of 3' comprises a pH range of between 2.5 to 3.4 using basic rounding." 623 F. Supp. 3d 389, 417 (D. Del. 2022). But the court also stated: "Had the patentee or the Court wanted to specify a pH of 3.0, it could have done so. It did not." *Id.* In this case, all the pH ranges have an additional significant figure (i.e., 3.0 rather than 3). So, the rounding in *Vifor* does not apply with the same force here. In the second case, *Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*, the court acknowledged that "[i]n some cases, the intrinsic record provides reasons to deviate from the standard rounding convention." No. 22-985, ECF No. 105 at 13 (D. Del. May 15, 2024). Yet the court in that case found "nothing in the intrinsic record of this case that would suggest to a person of ordinary skill in the art that a different rounding convention should be used in construing the asserted claims." *Id.* Here, there *is* evidence in the intrinsic record that some numbers are approximate and others are not.

As discussed above, the Asserted Patents are for a chemical composition. A chemical composition "exists at the moment the ingredients are mixed together." *Exxon*, 64 F.3d at 1558. A composition claim "is not time-limited" and includes "any product *at any time* that contains the claimed proportions of ingredients." *Id.* (emphasis added). So, the Asserted Patents cover any product that, at any time, has the claimed mix of ingredients, including "an aqueous solution having a pH range of between 3.7 and 4.3." '508 Patent col. 20 ll. 66–67.

The intrinsic evidence does not compel a different conclusion. The claims and specifications have no temporal limitation for pH. To be sure, other ingredients have express temporal limitations. In the '508 Patent, for instance, "the norepinephrine initially comprises at least 95% of R-isomer as determined by HPLC." *Id.* col. 21 ll. 1–4. And, "after storage at 25±2° C. and 60±5% relative humidity over at least three months, the norepinephrine comprises at least 90% R-isomer as determined by HPLC." *Id.* ll. 12–15. Thus, the inventors knew how to write a temporal limitation into a claim. The pH ranges pointedly do not have a temporal limitation. The Court declines to write what the inventors did not. Accordingly, the pH ranges are not limited to the time of formulation.

IV.     **CONCLUSION**

For the foregoing reasons, the Court adopts the following constructions:

1.  "chelating agent" means "a separate chemical compound able to bind a metal ion with at least two donor atoms or donor groups to form a stable ring structure."

2.  "tonicity agent" means "a separate chemical compound that increases the osmolality of the composition."

3.  Range terms are exact.

An appropriate Order accompanies this Opinion.

**DATED:** 3/6/2026

JULIEN XAVIER NEALS
United States District Judge